

FILED
IN OPEN COURT

Feb 23 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CRIMINAL NO. 1:11-CR-95 |
| v. ) | |
| ) | Count 1:     18 U.S.C. § 371 |
| MARCO PARENTI ADAMI, ) | (Conspiracy) |
| EMANUEL AGUSTONI, ) | |
| MICHELE BERGANTINO, ) | |
| and ) | |
| ROGER SCHAERER, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## INDICTMENT

February 2011 Term – At Alexandria

THE GRAND JURY CHARGES THAT:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

**The Bank**

1.      An international Swiss bank organized under the laws of Switzerland and

headquartered in Zurich, Switzerland, ("International Bank") directly and through its

subsidiaries, operated a global financial services business.  As one of the biggest banks in

Switzerland and largest wealth managers in the world, International Bank provided banking,

wealth management, asset management, and investment banking services, among other services,

around the globe, including through branches located in the United States.  For decades,

International Bank operated a U.S. cross-border business through which its private bankers

provided cross-border securities-related and investment advisory services to U.S. customers who maintained accounts at International Bank in Switzerland and other locations outside the United States. This cross-border business was conducted through substantial contacts with the customers in the United States. International Bank's managers and bankers working in the cross-border business knew and should have known that they were aiding and abetting U.S. customers in evading their U.S. income taxes. As of the fall of 2008, International Bank maintained thousands of undeclared accounts containing approximately $3 billion in total assets under management in those accounts.

2.    In order for an entity and its bankers to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security, that entity and its bankers were required under U.S. law to register as a broker-dealer and as an investment adviser with the United States Securities and Exchange Commission ("SEC"). Neither International Bank, nor certain of the bankers engaged in its cross-border business, were registered as broker-dealers and investment advisers with the SEC.

3.    In 1997, International Bank applied to the Federal Reserve Board under section 10(a) of the International Banking Act ("IBA") (12 U.S.C. § 3107(a)) to establish representative offices in Miami, Florida; New York, New York; and Houston, Texas. The Foreign Bank Supervision Enhancement Act of 1991 ("FBSEA"), which amended the IBA, provided that a foreign bank had to obtain the approval of the Board to establish a representative office in the United States. International Bank proposed to establish the representative offices primarily to act as liaison with private banking clients, solicit private banking business, and provide information and advice on economic conditions and investment opportunities in Switzerland. International

2

Bank represented to the Federal Reserve Board that it had the experience and capacity to support the proposed representative offices and had established controls and procedures for the proposed representative offices to ensure compliance with U.S. law. In 1998, the Federal Reserve Board granted International Bank's application. Prior to 1998, International Bank operated representative offices in New York, Los Angeles, San Francisco, Miami, and Houston under state banking regulations.

      4.     In or around January 2001, International Bank entered into a Qualified Intermediary Agreement ("QI Agreement") with the Internal Revenue Service ("IRS"). The QI Agreement required the bank to verify the identity and citizenship/domicile of its clients, through the execution of IRS Forms W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding, and W-9, Request for Taxpayer Identification Number and Certification, and to withhold and pay over to the IRS taxes on certain transactions from accounts beneficially owned by United States taxpayers.

      5.     In or about the fall of 2008, International Bank began the process of exiting its U.S. cross-border banking business.

**Other Swiss Banks**

      6.     A private Swiss bank organized under the laws of Switzerland ("Private Swiss Bank #1") was a family-owned private bank that was founded in 2000 and headquartered in Zurich, Switzerland that provided cross-border banking services to United States customers. On its website, Private Swiss Bank #1 touted its "strict policy to never open any branch or other representation outside the reach of the Swiss laws and jurisdiction . . ." because "[o]nly that way

can we be certain to maintain our values – and assure that no foreign authority will ever 'bully' us into giving them up." Private Swiss Bank #1 entered into a QI Agreement with the IRS.

7.      An Israeli bank with a head office in Tel Aviv, Israel, operated a subsidiary, organized under the laws of Switzerland, with offices in Geneva and Zurich, Switzerland ("Israeli Bank") that provided cross-border banking services to United States customers. Israeli Bank entered into a QI Agreement with the IRS.

8.      A private Swiss bank organized under the laws of Switzerland ("Private Swiss Bank #2") was a family-owned private bank with a head office in Zurich, Switzerland, and private banking locations in Lugano and Locarno, Switzerland, that provided cross-border banking services to United States customers. Private Swiss Bank #2 entered into a QI Agreement with the IRS.

**Investigation of Cross-Border Banking**

9.      As of March 23, 2009, the IRS offered the Offshore Account Voluntary Disclosure Program ("Voluntary Disclosure Program") to U.S. taxpayers as a means for those taxpayers to disclose their interests in undeclared accounts and avoid criminal prosecution. The program was open until October 15, 2009. Under the Voluntary Disclosure Program, the participants paid tax on the unreported income, a 20% accuracy penalty on the tax, and a 20% penalty on the high balance of the undeclared accounts, together with interest.

**U.S. Income Tax & Reporting Obligations**

10.     United States citizens, resident aliens, and legal permanent residents had an obligation to report to the IRS on the Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether that individual had a financial interest in, or signature authority over, a financial

account in a foreign country in a particular year by checking "Yes" or "No" in the appropriate box and identifying the country where the account was maintained. United States citizens, resident aliens, and legal permanent residents had an obligation to report all income earned from foreign bank accounts on the tax return and to pay the taxes due on that income.

11.     United States citizens, resident aliens, and legal permanent residents who had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the Department of the Treasury a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 (the "FBAR"). The FBAR for the applicable year was due by June 30 of the following year.

**Definitions**

12.     An "undeclared account" was a financial account owned by individuals subject to United States tax and maintained in a foreign country that had not been reported to the United States government on an income tax return and an FBAR.

13.     A "tax haven" was a country or territory whose institutions and laws, including bank secrecy laws, were intended to conceal financial information evidencing tax evasion from other countries.

14.     "Offshore charge, credit, and debit cards" were cards issued and caused to be issued by offshore financial institutions to holders of undeclared accounts to permit them to access the assets in the undeclared accounts while ensuring that their applications and records of transactions would be maintained offshore.

5

15. A "nominee" was a person or entity that was used to conceal the true owner's identity.

## THE CONSPIRATORS

16. Defendant MARCO PARENTI ADAMI, a citizen of Italy, resided in Switzerland. From at least on or about 1994 to the present, he served as a private banker for International Bank servicing a portfolio of high net worth North American clients and managing three other private bankers with a similar clientele. Most recently, defendant MARCO PARENTI ADAMI represented that he was employed by International Bank in Geneva, Switzerland as a member of senior management.

17. Defendant EMANUEL AGUSTONI, a citizen and resident of Switzerland, was employed as a private banker in Zurich, Switzerland first by International Bank and second by Private Swiss Bank #2, holding the title of Assistant Vice President at each institution. After leaving Private Swiss Bank #2, defendant EMANUEL AGUSTONI opened undeclared accounts at Private Swiss Bank #1 for U.S. customers.

18. Defendant MICHELE BERGANTINO, a citizen and resident of Switzerland, was employed by International Bank as a private banker in Zurich, Switzerland from approximately in or about 1982 through in or about 2009.

19. Defendant ROGER SCHAERER, a citizen of Switzerland and resident of the United States, was employed by International Bank as a Director and Senior Representative in its representative office in New York, New York.

## COUNT ONE
### (Conspiracy)

THE GRAND JURY FURTHER CHARGES THAT:

20.   The General allegations are incorporated in this Count.

### The Conspiracy and Its Object

21.   From in or around the 1960s to the present, the exact dates being unknown to the Grand Jury, in the Eastern District of Virginia and elsewhere, defendants

**MARCO PARENTI ADAMI,
EMANUEL AGUSTONI,
MICHELE BERGANTINO, and
ROGER SCHAERER,**

(collectively, "Defendants") did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree together and with each other and with others both known and unknown to the Grand Jury to commit the following offense against the United States:  to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of revenue:  to wit, U.S. income taxes, in violation of Title 18, United States Code, Section 371.

## Manner and Means of the Conspiracy

Among the manner and means by which the Defendants and their co-conspirators would and did carry out the conspiracy were the following:

22.     The Defendants and their conspirators solicited U.S. customers to open undeclared accounts because Swiss bank secrecy would permit them to conceal their ownership of accounts at International Bank and other Swiss banks;

23.     The Defendants and their conspirators set up, or caused to be set up, and utilized, or caused to be utilized, nominee tax haven entities to open undeclared accounts;

24.     International Bank's managers and bankers, in violation of International Bank's QI Agreement, accepted IRS Forms W-8BEN, or the bank's substitute forms, that falsely stated under penalties of perjury that the beneficial owner of the account was not subject to U.S. taxation;

25.     International Bank's managers and bankers, including the Defendants and their conspirators, utilized the bank's representative office in New York, New York, to provide banking and investment services to U.S. customers with undeclared accounts;

26.     The Defendants and their conspirators caused U.S. customers to travel outside the United States, to destinations including Switzerland and the Bahamas, to conduct banking related to their undeclared accounts;

27.     The Defendants and their conspirators provided unlicensed and unregistered banking services and investment advice to U.S. customers in person while on travel to the United States and by mailings, email, and telephone calls to and from the United States;

8

28.    Certain U.S. customers filed false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, which failed to report their respective interests in their undeclared accounts and the related income;

29.    U.S. customers failed to file and otherwise report their undeclared accounts on FBARs;

30.    The Defendants and their conspirators advised U.S. customers to structure, and caused U.S. customers to structure, withdrawals from their undeclared accounts in amounts less than $10,000 in an attempt to conceal the undeclared account and the transactions from U.S. authorities;

31.    The Defendants and their conspirators advised U.S. customers to utilize offshore charge, credit, and debit cards linked to their undeclared accounts and did provide such cards, including cards issued by American Express, Visa, and Maestro;

32.    The Defendants and their conspirators advised U.S. customers not to maintain in the United States account records related to their undeclared accounts;

33.    The Defendants and their conspirators caused International Bank, Private Swiss Bank #1 and Private Swiss Bank # 2 to retain in Switzerland account records related to the U.S. customers' undeclared accounts;

34.    The Defendants and their conspirators discouraged U.S. customers from disclosing their undeclared accounts to the IRS through the Voluntary Disclosure Program; and

35.    The Defendants and their conspirators encouraged and assisted U.S. customers to transfer their undeclared accounts at International Bank to other banks in Switzerland, including

Private Swiss Bank #1, Israeli Bank, and Private Swiss Bank # 2, and to a bank in Hong Kong as a means of continuing the concealment of their assets in undeclared accounts.

## Overt Acts

In furtherance of the conspiracy, and to effect the object thereof, the following overt acts were committed in the Eastern District of Virginia, and elsewhere:

**Client 1**

36.     In or around 1993, Client 1, a U.S. citizen and resident of Palm Beach, Florida, opened an undeclared account at International Bank and made an initial deposit into that account at an office of International Bank in New York, New York.

37.     In or around 1993, defendant MARCO PARENTI ADAMI telephoned Client 1 in the United States to introduce himself as the banker responsible for Client 1's undeclared account at International Bank.

38.     Beginning in or around the 1990s and continuing through in or around 2008, defendant MARCO PARENTI ADAMI mailed copies of statements for Client 1's undeclared account at International Bank to Client 1's home on the island of Saint Barths, an overseas collectivity of France, because defendant MARCO PARENTI ADAMI advised against mailing bank documents to the home of Client 1 in Palm Beach, Florida.

39.     In or around the late 1990s, defendant MARCO PARENTI ADAMI met in Florida with Client 1 to provide investment advice and discuss Client 1's undeclared account at International Bank.

40.     On or about October 11, 2006, defendant MARCO PARENTI ADAMI met with Client 1 at a hotel in New York, New York, to discuss the undeclared account at International Bank.

41.     On or about October 12, 2006, Client 1 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

42.     In or around 2008, defendant MARCO PARENTI ADAMI met with Client 1 in the Bahamas to discuss the undeclared account at International Bank because defendant MARCO PARENTI ADAMI was reluctant to travel to the United States.

43.     In or around 2008, Client 1 met with defendant MARCO PARENTI ADAMI in Geneva, Switzerland, to close the undeclared account at International Bank at which time defendant MARCO PARENTI ADAMI recommended transferring the undeclared account to an Israeli bank with a branch in Geneva or to a bank in Hong Kong and not repatriating the funds back to the United States in order to evade U.S. income taxes.

**Client 2**

44.     In or around 2004, Client 2, a U.S. citizen and resident of Norwood, New Jersey, at the direction of defendant MARCO PARENTI ADAMI, met with defendant ROGER SCHAERER at International Bank's representative office in New York, New York, to execute bank forms to make Client 2 a beneficial owner of an undeclared account at International Bank owned by the mother of Client 2.

11

45.     On or about April 15, 2006, Client 2 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

46.     In or around 2007, Client 2 met with defendant ROGER SCHAERER at International Bank's representative office in New York, New York, to execute bank forms to to add another individual's name to the undeclared account at International Bank.

47.     In or around September 2007, in response to Client 2's request to close the undeclared account at International Bank, defendant MARCO PARENTI ADAMI, via telephone, advised Client 2 that the undeclared account could be transferred to another offshore bank and that he could locate a Swiss lawyer to assist in the transfer.

**Clients 3 and 4**

48.     In or around 1983, on the advice of an International Bank banker, Client 3, an Iranian national residing in Beverly Hills, California, opened an undeclared account at International Bank in Switzerland in the name of a fictitious person.

49.     On or about October 12, 2006, Client 3 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

50.     In or around 2007, defendant MARCO PARENTI ADAMI sent a fax to Client 3 in the United States requesting to meet to discuss the undeclared account.

51.     In or around the Fall of 2007, defendant MARCO PARENTI ADAMI met at a hotel in Beverly Hills, California, with Client 3 and, Client 4, a U.S. citizen residing in Beverly Hills, California, who was the son of Client 3 and a beneficial owner of the undeclared account,

at which time defendant MARCO PARENTI ADAMI presented them with bank forms to close the undeclared account and to open a new undeclared account at International Bank.

52.    In or around December 2008, Client 4 met with defendant MARCO PARENTI ADAMI and another International Bank banker in Geneva, Switzerland.  After the meeting, the International Bank banker introduced Client 4 to a Swiss attorney who instructed Client 4 that if he wished to maintain the undeclared account as a "secret" undeclared account then he would have to create a trust to hold the money.

53.    In or around July 2009, during a meeting in Paris, France, the International Bank banker informed Client 4 that Client 4 had to close the undeclared account at International Bank but that he could transfer the account to a private bank in Switzerland instead of repatriating the funds to the United States.

**Client 5**

54.    In or around 1994, Client 5, a U.S. citizen and resident of Beverly Hills, California, opened an undeclared account at International Bank in Geneva, Switzerland, at which time he met defendant MARCO PARENTI ADAMI.

55.    In or around, 1997, on the advice of defendant MARCO PARENTI ADAMI, Client 5 opened an undeclared account at International Bank in the name of a nominee tax haven entity.

56.    In or around 1997, Client 5 met with defendant MARCO PARENTI ADAMI at a hotel in Los Angeles, California, at which time defendant MARCO PARENTI ADAMI provided account updates and copies of statements for the undeclared account that did not identify the account holder.

13

57.     In or around 2005, Client 5 met with defendant MARCO PARENTI ADAMI at a hotel in Los Angeles, California, at which time defendant MARCO PARENTI ADAMI provided account updates and copies of statements for the undeclared that did not identify the account holder.

58.     On or about September 16, 2006, Client 5 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

59.     In or around 2009, on the advice of defendant MARCO PARENTI ADAMI, Client 5 closed the undeclared account at International Bank and transferred it to a new undeclared account at Israeli Bank in Switzerland.

**Client 6**

60.     In or around 2003, defendant MARCO PARENTI ADAMI met with Client 6, a naturalized U.S. citizen residing in La Jolla, California, and discussed Client 6's undeclared account at International Bank and provided Client 6 with a copy of a bank statement for the account.

61.     On or about April 15, 2006, Client 6 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

**Clients 7 and 8**

62.     In or around 1953, Client 7, a U.S. citizen and resident of Elizabeth, New Jersey, opened an undeclared account at International Bank in Basle, Switzerland.

14

63.     On or about March 3, 1988, in response to a request from Client 7 to receive in the United States cash from the undeclared account, an International Bank banker mailed a letter from Switzerland to Client 7 in Elizabeth, New Jersey, in which he provided the status of the account, recommended a new investment strategy, stated that the bank would not transfer cash from Switzerland to the United States as it did not wish to comply with U.S. reporting requirements, and advised that the account holder could obtain the funds in Switzerland, or, in the alternative, offered "[m]aybe our people at [International Bank] in New York (100 Wall Street) can help you."

64.     In or about 2002, defendant EMANUEL AGUSTONI called from New York, New York to Client 8, a U.S. citizen and resident of Ossining, New York, at Client 8's home to discuss the undeclared account at International Bank that Client 8 inherited upon the death of Client 7 in 1988.

65.     On or about July 6, 2002, defendant EMANUEL AGUSTONI mailed to Client 8 in the United States a copy of defendant ROGER SCHAERER's business card and instructed him that defendant ROGER SCHAERER would be Client 8's contact in New York.

66.     In or about July 2002, on the advice of defendant EMANUEL AGUSTONI, Client 8 transferred the contents of his late father's undeclared account into a new undeclared account, opened in Client 8's name, at International Bank.

67.     On or about November 4, 2002, defendant EMANUEL AGUSTONI mailed from Switzerland to Client 8 in Ossining, New York, account opening documents for Client 8's undeclared account with instructions that he mail the executed documents either to him in

Switzerland or to defendant ROGER SCHAERER at International Bank's representative office in New York, New York.

68.     In or around May 2004, defendant EMANUEL AGUSTONI met with client 8 at a hotel in New York, New York, to review statements for Client 8's undeclared account and discuss investments.

69.     On or about April 16, 2005, defendant EMANUEL AGUSTONI called from Switzerland to Client 8 in Ossining, New York, and unsuccessfully solicited Client 8 to close the undeclared account at International Bank and transfer it to Private Swiss Bank # 2.

70.     In or around December 2005, defendant EMANUEL AGUSTONI mailed from Switzerland to Client 8 in Ossining, New York, a greeting card in which he proposed to meet with Client 8 and provided his email address at Private Swiss Bank # 2.

71.     On or about April 15, 2006, Client 8 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

72.     In or around Spring 2009, defendant EMANUEL AGUSTONI called from Switzerland to Client 8 in the United States and solicited Client 8 to close the undeclared account at International Bank and transfer it to Private Swiss Bank # 2 and inquired whether Client 8 was aware of the Department of Justice's criminal investigation of UBS.

73.     In or around August 2009, Client 8 met with an International Bank banker in Zurich, Switzerland, to close the undeclared account at which time the banker suggested that rather than repatriate the funds to the U.S. that he transfer the account to another Swiss bank.

**Clients 9 and 10**

74.     In or around 2002, defendants ROGER SCHAERER and EMANUEL

AGUSTONI met with Client 9, a U.S. citizen and resident of New York, New York, and Client

10, a U.S. citizen and resident of Palm Desert, California, at International Bank's representative

office in New York, New York, to open undeclared accounts at International Bank.

75.     In or around June 2002, in Zurich, Switzerland, on the advice of defendant

EMANUEL AGUSTONI, Client 9 opened an undeclared account in the name of a nominee tax

haven entity at International Bank.

76.     In or around 2002, defendant EMANUEL AGUSTONI sent via DHL from

Switzerland to Client 9 in New York, New York, an American Express charge card and a

Maestro debit card linked to Client 9's undeclared account at International Bank with the

instruction that Client 9 limit the use of the cards to times when Client 9 was in Europe.

77.     Beginning in or about 2003, and continuing through 2008, Client 9 periodically

met with defendant ROGER SCHAERER in New York, New York, to discuss the performance

of the undeclared accounts at International Bank.

78.     In or around 2003, Client 10 met with defendant EMANUEL AGUSTONI in

Zurich, Switzerland, to open an undeclared account at International Bank.

79.     In or around 2003, in Zurich, Switzerland, defendant EMANUEL AGUSTONI

provided Client 10 with an American Express charge card and Maestro debit card linked to the

undeclared account and instructed that Client 10 only use the charge card and debit card in

Europe.

80.    In or around 2003, in Zurich, Switzerland, defendant EMANUEL AGUSTONI informed Client 9 that International Bank would send money from the undeclared account to the United States in the form of a bank check but advised that Client 9 should not receive individual checks in excess of $10,000 in order to avoid the suspicion of Client 9's U.S. bank.

81.    In or about February 12, 2003, defendant EMANUEL AGUSTONI caused to be sent via DHL from Switzerland to Client 9 in New York, New York, cash withdrawn from the undeclared account at International Bank in the form of a bank check payable to Client 9 in the amount of $5,400 and a bank check payable to Client 9's spouse in the amount of $4,534.62.

82.    In or about March 2004, Client 9 contacted International Bank officials at the representative office in New York, New York and directed them to make available for withdrawal funds from the undeclared account at an International Bank office in Zurich, Switzerland.

83.    On or about March 16, 2004, after making a request to bankers at International Bank's representative office in New York, New York, Client 9 withdrew $20,000 in cash from the undeclared account at an International Bank office in Zurich, Switzerland.

84.    In or around 2005, defendant EMANUEL AGUSTONI met with Client 10 in Switzerland and solicited Client 10 to close the undeclared account at International Bank and transfer it to Private Swiss Bank # 2.

85.    In or about January 12, 2006, an International Bank banker caused to be sent via DHL from Switzerland to Client 10 in New York, New York, cash withdrawn from the undeclared account at International Bank in the form of a bank check payable to Client 9 in the amount of $4,876.64 and a bank check payable to Client 9's spouse in the amount of $5,176.68.

18

86.     On or about April 15, 2006, Client 9 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

87.     On or about April 15, 2006, Client 10 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

88.     In or around December 2008, Client 9 contacted International Bank officials at the representative office in New York, New York, and directed them to make available for withdrawal funds from the undeclared account at an International Bank office in Nassau, Bahamas.

89.     On or about December 17, 2008, after making a request to bankers at International Bank's representative office in New York, New York, Client 9 withdrew $20,000 in cash from the undeclared account at an International Bank office in Nassau, Bahamas.

90.     In or about March 5, 2009, an International Bank banker caused to be sent via DHL from Switzerland to Client 9 in New York, New York, cash withdrawn from the undeclared account at International Bank in the form of a bank check payable to Client 9 in the amount of $2,613.63 and a bank check payable to Client 9's spouse in the amount of $2,463.63.

91.     In or around 2009, in Zurich, Switzerland, International Bank bankers informed Client 9 that Client 9 had to close the undeclared account and advised Client 9 to contact defendant EMANUEL AGUSTONI regarding transferring the undeclared account to another Swiss bank.

92.     In or around 2009, defendant EMANUEL AGUSTONI met with Client 10 at a hotel in New York, New York, and solicited Client 10 to close the undeclared account at International Bank and transfer it to another Swiss bank.

**Client 11**

93.     In or about August 2006, in Zurich, Switzerland, Client 11, a naturalized U.S. citizen residing in Charlottesville, Virginia, opened an undeclared account at International Bank in Switzerland.

94.     On or about August 16, 2006, Client 11 departed from Dulles International Airport, in the Eastern District of Virginia, on a flight bound for Zurich, Switzerland, for among other reasons, to meet with an International Bank banker in Zurich, Switzerland, to discuss the undeclared account.

95.     On or about April 15, 2007, Client 11 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2006 that failed to report the undeclared account and related income.

96.     On or about July 7, 2008, Client 11 departed from Dulles International Airport, in the Eastern District of Virginia, on a flight bound for Zurich, Switzerland, for among other reasons, to meet with an International Bank banker in Zurich, Switzerland, to discuss the undeclared account.

97.     On or about June 12, 2009, Client 11 departed from Dulles International Airport, in the Eastern District of Virginia, on a flight bound for Zurich, Switzerland, for among other reasons, to meet with an International Bank banker in Zurich, Switzerland, to discuss the undeclared account.

**Clients 12, 13, 14 and 15**

98.     In or around the late 1960s, Clients 12 and 13, a married couple who were U.S. citizens and residents of Pittsburgh, Pennsylvania, opened an undeclared account in their own names at International Bank in Switzerland

99.     On or about June 18, 2003, Clients 12 and Client 13 spoke by telephone from an International Bank office in Nassau, Bahamas, with defendant EMANUEL AGUSTONI in Switzerland regarding the undeclared account.

100.    On or about June 18, 2003, at a International Bank office in Nassau, Bahamas, Client 14, the daughter of Client 12 and Client 13, executed a bank form giving her signature authority over her parents' undeclared account.

101.    In or around late-2003, on the instruction of defendant EMANUEL AGUSTONI, Client 14 met with defendant ROGER SCHAERER at International Bank's representative office in New York, New York, regarding Client 14's parents' undeclared account.

102.    In or around Spring 2004, in Zurich, Switzerland, on the advice of defendant EMANUEL AGUSTONI, Clients 12 and 13 closed their undeclared account at International Bank and opened a new undeclared account in the name of a nominee tax haven entity.

103.    On or about April 15, 2006, Clients 12 and 13 jointly filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

104.    On or about July 3, 2008, defendant EMANUEL AGUSTONI mailed from Switzerland to Clients 12 and 13 in Pittsburgh, Pennsylvania, bank forms to open an undeclared account in the name of the nominee tax haven entity at Private Swiss Bank # 2.

21

105. In or around January 2009, Clients 12 and 13 closed their undeclared account at International Bank and transferred it to Private Swiss Bank # 2.

106. In or around May 2009, at a meeting at the home of Clients 12 and 13 in Pittsburgh, Pennsylvania, defendant EMANUEL AGUSTONI informed Clients 12 and 13 of the Department of Justice's criminal investigation of UBS and advised them to close their undeclared account at Private Swiss Bank # 2 and open a new account in the name of the nominee tax haven entity at Private Swiss Bank # 1.

107. On or around July 2009, Clients 12 and 13 closed the undeclared account at Private Swiss Bank # 2 and transferred it to Private Swiss Bank # 1.

108. In or around Summer 2009, Client 15, the daughter of Clients 12 and 13, spoke with defendant EMANUEL AGUSTONI over the telephone at which time defendant EMANUEL AGUSTONI discouraged the participation of Clients 12, 13, 14 and 15 in the Voluntary Disclosure Program.

**Client 16**

109. In or around the 1990s, Client 16, a legal permanent resident of the United States residing in Oakland, New Jersey, met with defendant EMANUEL AGUSTONI in the office of defendant ROGER SCHAERER at International Bank's representative office in New York, New York, at which time defendant EMANUEL AGUSTONI advised Client 16 to open at International Bank an undeclared account in the name of a nominee tax haven entity.

110. In or around the 1990s, an International Bank banker working at International Bank's representative office in New York, New York, traveled to Client 16's home in Oakland, New Jersey, and had Client 16 sign bank forms to open an undeclared account at International

Bank in the name of a nominee tax haven entity.

111. On or about May 1, 2006, Client 16 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

**Client 17**

112. In or around 2002, in Zurich, Switzerland, in a meeting to discuss an undeclared account held in the name of a nominee tax haven entity, Client 17, a naturalized U.S. citizen residing in Miami Beach, Florida, was shown a copy of an account statement by defendant MICHELE BERGANTINO and advised that defendant ROGER SCHAERER worked for International Bank in the United States and would be able to assist Client 17 with banking.

113. On or about July 13, 2006, Client 17 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

114. In or around September 2008, in Zurich, Switzerland, in response to Client 17's statement that client 17 was a U.S. resident and a question about Client 17's U.S. tax reporting obligations, defendant MICHELE BERGANTINO advised Client 17 that she had no reporting obligations as she had originally opened the undeclared account with an Iranian passport and, as such, International Bank would have recorded in its files that she was not a U.S. taxpayer.

(All in violation of Title 18, United States Code, Section 371.)

A TRUE BILL

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

FOREPERSON

NEIL H. MACBRIDE
United States Attorney
Eastern District of Virginia

By: _____
Mark D. Lytle
Assistant U.S. Attorney

JOHN A. DICCICO
Acting Assistant Attorney General
Tax Division

By: _____
Kevin M. Downing
John E. Sullivan
Senior Litigation Counsel

Mark F. Daly
Melissa S. Siskind
Tino M. Lisella
Trial Attorneys